# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAMP NE'ER TOO LATE, LP, | : | No. 4:14-cv-01715 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| SWEPI, LP, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

## May 5, 2016

The renowned eighteenth-century English poet Alexander Pope once wrote, "Blessed is the man who expects nothing, for he shall never be disappointed."[1] The dispute presently before the Court was fueled by the outsized and unsupported expectations of landowners who entered into a natural gas lease and subsequent agreements during a time when such exploration was steadily reaching its zenith in Pennsylvania's northern tier counties. As the natural gas boom gradually winnowed, drilling

_____

[1]   Letter, written in collaboration with John Gay, to William Fortescue (Sept. 23, 1725).

companies, like the one hauled into court here, reacted with contractionary business decisions that included, among other defensive strategies, halting plans for the development of future wells.

The unfolding of this dispute has confirmed the well-established principle that the disappointment and dissatisfaction felt by a natural gas lessor as a result of the lessee's failure to develop its property—what plaintiff's representatives in this case have called their "shattered dreams"—do not afford the lessor a remedy at law if such development is not mandated by the clear text of an agreement between the parties.

Plaintiff, Camp Ne'er Too Late, LP, petitions this Court to extrapolate a set of contractual obligations on the part of Defendant, SWEPI, LP, from a single introductory paragraph of a right-of-way addendum, which Plaintiff's representatives drafted. This Court considers it highly unbefitting for federal judges to substitute their own predilections for those of the litigants who appear before them, particularly when those litigants have already expressed their intentions in the clear text of a bargained-for agreement.

Consequently, because Plaintiff's case theory simply is not borne out either by the text of the parties' agreements or the plain reality of the parties' course of dealings, its request that the Court engage in judicial revisionism of the instant natural gas lease and intervene on its behalf, now having the benefit of hindsight, must be rejected. Instead, this Court will honor the written agreement for which the parties bargained. As such and in accordance with the following reasoning, Defendant's Motion for Summary Judgment is granted and Plaintiff's corresponding Motion for Summary Judgment is denied.[2]

## I.   BACKGROUND[3]

### A.   Ne'er Too Late Lodge and East Resources, Inc., negotiate and execute the 2008 lease and addendum.

---

[2]   ECF No. 8 at 2.

[3]   Local Rule 56.1 states that the party opposing a motion for summary judgment shall file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement of material facts and noting genuine issues to be tried. All material facts in the statement of the moving party are admitted unless properly refuted by the opposing party. Id. See also Pinegar v. Shinseki, No. CIV.A.1:07-CV-0313, 2009 WL 1324125, at *1 (M.D. Pa. May 12, 2009) (Conner, J.) ("The purpose of this rule is obvious: it enables the court to identify contested facts expeditiously and prevents factual disputes from becoming obscured by a lengthy record.").

The instant dispute springs from the terms of natural gas lease governing a wooded 230-acre plot of land in Rutland Township, Tioga County, Pennsylvania.[4] That property, to which the subject lease applies, was acquired by Ne'er Too Late Lodge, a Pennsylvania nonprofit corporation, in 1966.[5] The nonprofit entity Ne'er Too Late Lodge shares its name with a small cabin that sits on the land in question, land which according to one of Plaintiff's partners, has been used throughout the years for private brook trout fishing, hunting, and similar outdoor activities.[6]

On June 17, 2008, Ne'er Too Late Lodge and SWEPI, LP's predecessor-in-interest, East Resources, Inc., executed the oil and gas lease that ultimately gave rise to the present litigation.[7] The lease was negotiated on behalf of Ne'er Too Late Lodge by shareholder-brothers Robert A. Schwoyer and David Schwoyer, Sr., both of whom would later become general partners in Camp Ne'er Too Late, LP, the organization formed by Ne'er Too Late Lodge's shareholders to manage the business affairs

---

[4]    ECF No. 29 Ex. 8 (2008 Natural Gas Lease).

[5]    ECF No. 29 Ex. 2 (1966 Rutland Deed).

[6]    ECF No. 36 Ex. 10 at 62, 77 (David Schwoyer Dep. 62:11–15, 77:02–15.

[7]    ECF No. 29 at 4 ¶ 16. ECF No. 38 at 3 ¶ 16.

associated with the lease.[8] David Schwoyer would also go on to testify in this matter as Plaintiff's Federal Rule of Civil Procedure 30(b)(6) designee.

In 2008, the parties agreed to a "paid-up" lease, meaning that Ne'er Too Late Lodge, solely for entering into the lease, received an up-front payment of $287,500, which compensation was comprised of a bonus and accelerated delay rental fees.[9] The lease also provided that Ne'er Too Late Lodge would receive as a royalty payment one-eighth of the proceeds realized by East Resources through its sales of natural gas extracted from the property.[10]

According to the text of the agreement, Ne'er Too Late Lodge leased the subject land to East Resources "for the purpose of exploring for, developing, producing and marketing oil and gas."[11] The parties do not dispute that the lease gave East Resources the authority to place well pads on the leased premises and that nothing in the lease required the drilling

---

[8]   ECF No. 29 at 4 ¶¶ 16–17. ECF No. 38 at 3 ¶¶ 16–17. ECF No. 36 Ex. 10 at 39 (D. Schwoyer Dep. 39:19–25).

[9]   ECF No. 36 Ex. 10 at 211 (D. Schwoyer Dep. 211:12–16).

[10]  ECF No. 29 Ex. 8 at 2 ¶ 4 ("Royalty Payment").

[11]  ECF No. 29 Ex. 8 at 2 ¶ 1 ("Lease").

of any number of wells.[12] In fact, prior to the expiration of the primary

term of the lease, only one well had actually been drilled on the land.[13]

Importantly, the Lease also granted East Resources the right to

construct pipelines throughout the leased premises.[14] Specifically,

Paragraph 11 of the lease ("Ancillary Rights"), provides that Ne'er Too

Late Lodge granted to East Resources "the right of ingress and egress over,

under and through said leased premises with the right to conduct such

exclusive operations on the leased premises as may be necessary for such

purposes, including but not limited to . . . the constructions and use of

roads, pipelines, tanks, water wells, disposal wells injection wills, pits

electric and telephone lines, and other facilities."[15]

Although the lease provided that such constructions could be made

"regardless of the source of such substances," during the course of the

negotiations, the parties composed a lease addendum containing twenty

additional paragraphs, one of which—Paragraph 12—restricted East

---

[12]   ECF No. 29 at 4 ¶¶ 16–17. ECF No. 38 at 3 ¶¶ 16–17.

[13]   ECF No. 29 at 5 ¶¶ 22–23. ECF No. 38 at 3 ¶¶ 22–23.

[14]   ECF No. 29 at 5 ¶ 27. ECF No. 38 at 4 ¶ 27.

[15]   ECF No. 29 Ex. 8 at 3 ¶ 11 ("Ancillary Rights").

Resources from constructing a pipeline on the leased premises unless that

pipeline was used to transfer oil and/or gas from one or more wells drilled

on the leased premises.[16] In the context of natural gas leases, gas

transported across leased premises that is drilled from those same

premises is known as "domestic" or "native" gas.[17] The parties attached

the addendum to the lease and explicitly incorporated it.[18] The addendum

provisions were therefore made effective upon execution of the lease itself.

For the record, I will also note that the parties do not dispute either that

the lease was a completely integrated document with a standard

integration clause or that the lease disclaimed any and all implied

obligations.[19]

---

[16]  ECF No. 29 Ex. 8 at 7 ¶ 12 ("Pipelines shall not be constructed on the leased premises except for those used to transport oil and/or gas from a well(s) drilled on leased premises or land pooled therewith."). See also ECF No. 29 at 5 ¶ 27. ECF No. 38 at 4 ¶ 27.

[17]  ECF No. 36 Ex. 10 at 160 (D. Schwoyer Dep. 160:1–3). See also Jacobs v. CNG Transmission Corp., 332 F. Supp. 2d 759, 768 (W.D. Pa. 2004).

[18]  ECF No. 29 Ex. 8 at 4 ("SEE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF").

[19]  ECF No. 29 at 6 ¶¶ 32–33. ECF No. 38 at 6 ¶¶ 32–33.

At this juncture, it is also important to note that because Defendant ultimately did construct a pipeline that transported non-native gas over the subject land, the elemental issue in this litigation is whether the text of certain subsequent agreements between the parties incorporated Paragraph 12 of the lease addendum in any manner. Because the text of those agreements indicates otherwise, I conclude in my analysis below that Paragraph 12 of the lease addendum was not so incorporated.

 Shortly thereafter, the shareholders of Ne'er Too Late Lodge engaged in the first of two inconsistent transactions. On November 14, 2008, five months after the lease was executed, Ne'er Too Late Lodge assigned all of its rights under the lease to its individual shareholders.[20] As part of the assignment, each of Ne'er Too Late Lodge's nine shareholders accepted an interest in the rights under lease in proportion to their ownership share in Ne'er Too Late Lodge.[21] That assignment was never

---

[20]   ECF No. 29 at 5 ¶ 24. ECF No. 38 at 3 ¶ 24.

[21]   ECF No. 29 Ex. 3 at 3.

recorded.[22] The second inconsistent transaction would occur in April 2010

and is detailed below in Part I.C.

### B.   Ne'er Too Late Lodge and East Resources negotiate and execute the 2009 right-of-way agreement.[23]

Despite the lease and its addendum having already given East

Resources the right to construct a pipeline on the leased premises that

carried only domestic gas, the parties nevertheless found it necessary to

negotiate two right-of-way agreements that granted East Resources the

ability to construct such a pipeline. These two subsequent right-of-way

agreements did not include any limitations as to domestic gas or explicit

references to Paragraph 12 of the lease addendum. Each of the subsequent

right-of-way agreements also entailed additional consideration paid to

Plaintiff or its predecessor-in-interest beyond what the lease required.

---

[22]  ECF No. 29 at 3 ¶ 12. ECF No. 38 at 2 ¶ 12.

[23]  Though the 2009 right-of-way agreement indicates that the granting party was "Camp Ne'er Too Late," Camp Ne'er Too Late, LP, was not formed until 2010. David Schwoyer, Sr., would later explain in his deposition that the term "Camp Ne'er Too Late" was also used as a locational reference point to describe the lands held by the corporate entity Ne'er Too Late Lodge. ECF No. 36 Ex. 10 at 61:01–13. For the sake of consistency and to remain faithful to the true legal entities, I refer to the granting party by its corporate name, Ne'er Too Late Lodge.

These characteristics of the right-of-way agreements have now led

Defendant, quite rightly in this Court's view, to argue that these peripheral

agreements effectively granted it greater rights than what its predecessor-

in-interest initially enjoyed under the lease, namely, the right to construct a

pipeline capable of transporting non-native gas.

Accordingly, in 2009, Ne'er Too Late Lodge and East Resources

began negotiating over what would be the first of two pipeline right-of-

way agreements that were eventually executed as to the subject land.

Though the 2010 right-of-way agreement, due to certain of its unique

terms, is the document that largely gave rise to the present dispute, the

Court will also briefly review the facts surrounding the execution of the

2009 agreement and 2011 amendment for the sake of completeness.

The 2009 right-of-way agreement was executed on November 28,

2009 and gave East Resources "the right to lay, maintain and remove a

pipeline(s) over and through" the leased premises.[24] Terry Bryant was the

landman, the agent of East Resources with whom Robert A. Schwoyer

---

[24]   ECF No. 29 Ex. 10 at 2.

negotiated.[25] During his Rule 30(b)(6) deposition, David Schwoyer, Sr., could not recall any discussions with Mr. Bryant related to how the 2009 right-of-way agreement interacted with the Lease.[26]

Though nothing in the agreement references the lease or limits the location of the pipeline, a proposed pipeline map was attached to the agreement.[27] Nevertheless, during his Rule 30(b)(6) deposition, Mr. Schwoyer admitted that a pipeline was never constructed in the particular way that the map depicted.[28]

The parties do not dispute that 2009 right-of-way agreement provided for compensation of five dollars per linear foot of the actual footage that East Resource's eventual right-of-way would utilize.[29] The 2009 agreement was a fully integrated document, and as far as both parties are concerned, although an additional right-of-way agreement was

---

[25]   ECF No. 29 at 7 ¶¶ 36–37. ECF No. 38 at 5 ¶¶ 36–37.

[26]   ECF No. 29 at 7 ¶ 38. ECF No. 38 at 5 ¶ 38.

[27]   ECF No. 29 at 7 ¶¶ 39–40. ECF No. 38 at 5 ¶¶ 39–40.

[28]   ECF No. 36 Ex. 10 at 108 (Schwoyer Dep. 108:7–13).

[29]   ECF No. 29 at 7 ¶ 41. ECF No. 38 at 5 ¶ 41.

negotiated, Plaintiff was never told that the 2009 agreement was invalid or

no longer in force.[30]

>    **C.**    **The shareholders of Ne'er Too Late Lodge form Camp Ne'er
>    Too Late, LP, in April 2010. Ne'er Too Late Lodge thereafter
>    transfers its rights under the lease to Camp Ne'er Too Late
>    in August 2010, despite having already transferred those
>    rights to its individual shareholders in November 2008.**

In April of 2010, the second of two conflicting transactions was

effected by Ne'er Too Late Lodge. As discussed above in Part I.A, in

November 2008, Ne'er Too Late Lodge assigned its rights under the lease

to its individual shareholders in proportion to their ownership interest in

the Ne'er Too Late Lodge. However, on August 2, 2010, Ne'er Too Late

Lodge once again assigned its rights under the lease, this time to Camp

Ne'er Too Late, LP, a limited partnership created in April 2010 by the nine

individual shareholders of Ne'er Too Late Lodge to manage the business

affairs associated with the lease.[31] Unlike the first assignment of the lease

_____

[30]   ECF No. 29 at 8 ¶¶ 42–43. ECF No. 38 at 5 ¶¶ 42–43.

[31]   ECF No. 29 Ex. 1. Although Plaintiff has provided the percentage of each
shareholder's capital contribution to Lodge, I agree with Defendant that the
issue of whether the supplied ownership breakdown of Camp Ne'er Too
Late, LP is identical to that of Ne'er Too Late Lodge (and consequently, that
of the November 2008 assignment) is unresolved on the present record, as the

rights to Ne'er Too Late Lodge's shareholders, this subsequent assignment

was recorded in the Office of the Recorder of Deeds of Tioga County,

Pennsylvania.[32]

To ascertain the purpose behind these two contradictory

assignments, Plaintiff's current counsel, during Plaintiff's Rule 30(b)(6)

deposition on June 30, 2015, telephoned former counsel for Plaintiff who

had overseen the assignments.[33] As a result of that conversation, Plaintiff

has stipulated that the August 2010 assignment assigned to Camp Ne'er

Too Late only those rights that remained after the November 2008

assignment to the individual shareholders of Ne'er Too Late Lodge.[34]

Thus, the parties agree that the individual shareholders—and not Camp

---

Court has only been provided with the initial capital contribution breakdown but not with the proportions of ownership as they relate to the rights under the lease. See ECF No. 29 at 3 ¶ 13. ECF No. 38 at 2 ¶ 13. Compare ECF No. 29 Ex. 1 at 23 (listing ownership percentages), with ECF No. 29 Ex. 3 (listing no ownership percentages).

[32]  Id. See also ECF No. 29 Ex. 5. Neither party discusses the potential that the November 2008 transfer, not having been recorded, would have fallen second in priority as to the August 2010 recorded assignment or the result such dynamic would have had upon the standing issue.

[33]  ECF No. 29 Ex. at 5–7.

[34]  ECF No. 38 at 2 ¶ 13.

Ne'er Too Late—were the actual assignees of the Ne'er Too Late Lodge's

rights under the lease.[35] Moreover, at no time did the individual

shareholders either: (i) convey their rights back to Ne'er Too Late Lodge

before the August 2010 transfer from Ne'er Too Late Lodge to Camp Ne'er

Too Late or (ii) assign them directly to Camp Ne'er Too Late.[36]

**D.    Camp Ne'er Too Late and East Resource's successor-in-interest, East Resources Management, negotiate and execute the 2010 right-of-way agreement and addendum.**

In 2010, further right-of-way negotiations were held between the

parties. On June 1, 2010, East Resources transferred its interest in the

leased premises, including the lease and the 2009 right-of-way agreement,

to East Resources Management.[37] Mr. Bryant and Mark Schall were the

landmen with whom Plaintiff negotiated in 2010.[38] On October 19, 2010,

Camp Ne'er Too Late and East Resources Management executed the 2010

right-of-way agreement, the second of two right-of-way agreements

---

[35]  <u>Id.</u>

[36]  ECF No. 29 at 3 ¶¶ 14–15. ECF No. 38 at 2–3 ¶¶ 14–15.

[37]  ECF No. 29 at 8 ¶ 44. ECF No. 38 at 6 ¶ 44.

[38]  ECF No. 29 at 8 ¶ 48. ECF No. 38 at 6 ¶ 48.

relating to the subject premises and the one that is largely responsible for this dispute.[39]

As initially presented to Plaintiff, the 2010 right-of-way agreement did not contain an addendum.[40] When Plaintiff's representatives informed Mr. Bryant that they had some concerns regarding the proposal, Mr. Bryant sent Plaintiff a telefax of certain notes detailing the typical provisions found in an addendum and informed Plaintiff to "put [its] thoughts down and we will go from there."[41]

No one from East Resources Management forbid Plaintiff from making changes to the proposed addendum.[42] In fact, Plaintiff proposed a number of terms and revisions to the addendum, many of which were accepted.[43] David Schwoyer, Sr., recalls "revising some of the addendum

---

[39]   ECF No. 29 at 8 ¶ 45. ECF No. 38 at 6 ¶ 45. <u>See also</u> ECF No. 29 Ex. 12.

[40]   ECF No. 29 at 9 ¶ 49. ECF No. 38 at 6 ¶ 49.

[41]   ECF No. 29 at 9 ¶ 50. ECF No. 38 at 6 ¶ 50.

[42]   ECF No. 29 at 9 ¶ 52. ECF No. 38 at 6 ¶ 52.

[43]   ECF No. 29 at 9 ¶¶ 53–54. ECF No. 38 at 6 ¶¶ 53–54.

language," as "things were going back and forth" between Plaintiff and

East Resources Management's representatives.[44]

While it was revising the language of the addendum to the 2010

right-of-way agreement, Plaintiff was not represented by counsel. "We had

somebody we could call, I guess, if we had a concern," David Schwoyer,

Sr., remembered, "but nobody was involved I believe at this time with

us."[45] Rather than consult an experienced oil and gas lawyer, Plaintiff's

representatives negotiated with East Resources Management on their own

and made the textual revisions themselves, consulting one another and

proposing amendments through group emails.

In one of those emails between brothers Robert and David

Schwoyer, Sr., Robert Schwoyer writes "David, look at item 12 of our

original gas lease and see if it applies . . . ."[46] David Schwoyer took his

brother's question "[t]o basically address the fact that if we are going to

assign a right-of-way, we want to make sure that we are consistent with

---

[44]   ECF No. 36 Ex. 10 at 124 (D. Schwoyer Dep. 124:01–05).

[45]   ECF No. 36 Ex. 10 at 125 (D. Schwoyer Dep. 125:04–18).

[46]   ECF No. 36 Ex. 10 at 125–26 (D. Schwoyer Dep. 125:19–126:01).

the original oil and gas lease."[47] Eventually, on October 12, 2010, Schwoyer

would write to two other of Plaintiff's partners, "I tired [sic] sick of looking

at the document as I have read, re-read, edited, deleted and added

numerous items."[48] Schwoyer went on to write, "Let's make sure we are

saying what we need to say but lets [sic] get it done already!"[49]

What ultimately resulted from these drafts were certain revisions to

the introductory paragraph of the addendum to the 2010 right-of-way

agreement. David Schwoyer does not deny that he is the individual

responsible for the drafting of the contested language. During his Rule

30(b)(6) deposition, Mr. Schwoyer was asked by Jeremy A. Mercer,

Esquire, counsel for Defendant, "Were you the one who made the change

to that paragraph to add that additional text . . . ?"[50] Mr. Schwoyer

answered, "Yes."[51]

---

[47]   ECF No. 36 Ex. 10 at 126 (D. Schwoyer Dep. 126:02–07).

[48]   ECF No. 29 Ex. 14 at 2.

[49]   Id.

[50]   ECF No. 36 Ex. 10 at 132 (D. Schwoyer Dep. 132:09–11).

[51]   ECF No. 36 Ex. 10 at 132 (D. Schwoyer Dep. 132:12).

After Mr. Schwoyer's revisions were incorporated into the final version of the addendum to the 2010 right-of-way agreement on October 19, 2010, the introductory paragraph of that document read as follows:

> This addendum is attached to and made part of that certain Right of Way Agreement dated <u>October 19, 2010.</u> If any of the following provisions conflict with or are inconsistent with any of the printed provisions or terms of the Right of Way Agreement or Original Oil and Gas Lease and Addendum the following provisions, and the non conflicting terms of the Original Oil and Gas Lease and its Addendum, shall control and be deemed to supersede the printed terms of the Right of Way Agreement.[52]

When pressed as to the effect of this language during his Rule 30(b)(6) deposition, Mr. Schwoyer suggested that he intended the language to reference "back to and incorporate at least paragraph 12 of the addendum to the oil and gas lease."[53] However, Mr. Schwoyer conceded that he failed to "specifically identify paragraph 12 in that text," even though he acknowledged that he "could have, if [he] wanted to, have put in the proposed addendum language that specifically referred to item 12 of

---

[52]   ECF No. 29 at 10–11 ¶ 59. ECF No. 38 at 6 ¶ 59. <u>See also</u> ECF No. 29 Ex. 12 at 5 ("Addendum").

[53]   ECF No. 36 Ex. 10 at 132–33 (D. Schwoyer Dep. 132:25–133:04).

the oil and gas lease."[54] Furthermore, when asked whether he ever recalled discussing Paragraph 12's limitations on domestic gas with the landmen, Mr. Schwoyer responded, "I can't remember specifically what was said as far as whether or not we specifically told him about that."[55]

The parties agree that the 2010 right-of-way agreement contained an integration clause.[56] Still, in its answer to Defendant's Statement of Facts, Plaintiff averred that its representatives "conveyed to Mark Shall [sic] that the reason that the second sentence of the first paragraph of the 2010 Right of Way addendum was put in there was because the Plaintiff had a concern that this document would change the protections in the Lease and the Plaintiff wanted to make sure the 2010 Right of Way and [sic] didn't change any of the protections that were already stated in the Lease."[57] Moreover, Plaintiff contends that Mr. Schall provided estimates that Plaintiff's representatives could use to calculate projected revenue.[58]

---

[54]   ECF No. 36 Ex. 10 at 119, 127 (D. Schwoyer Dep. 119:01–14, 127:04–09).

[55]   ECF No. 36 Ex. 10 at 114 (D. Schwoyer Dep. 115:22–23).

[56]   ECF No. 29 at 14 ¶ 76. ECF No. 38 at 9 ¶ 76.

[57]   ECF No. 38 at 37–38 ¶ 66.

[58]   ECF No. 38 at 17 ¶ 137.

Taking into account the existence of a valid integration clause and reading the portions of Mr. Schall's deposition to which Plaintiff cites for support, I cannot agree that Plaintiff has raised a genuine dispute as to any specific knowledge on Mr. Schall's part as to Plaintiff's purported concern with transportation of domestic gas.  Instead, the pertinent portions of Mr. Schall's depositions reveal that the only concerns of which he was specifically informed involved water testing and expiration of the lease.[59] In fact, Mr. Schall recalls informing Plaintiff during negotiations that "[W]e are putting the pipeline under the terms of the right-of-way agreement, and it's completely separate from your oil and gas lease."[60] In addition, as explained more fully below, such extrinsic evidence or documents are hardly relevant where the text of the agreements is so clearly integrated.

East Resources Management paid Plaintiff $59,610.00 in consideration for the 2010 right-of-way agreement.[61] During Plaintiff's Rule 30(b)(6) deposition, counsel for Defendant tasked Mr. Schwoyer to

[59]   ECF No. 38 Ex. 6 at 59 (Schall Dep. 59:04–10).

[60]   ECF No. 38 Ex. 6 at 58 (Schall Dep. 58:20–23).

[61]   ECF No. 29 at 14 ¶ 78. ECF No. 38 at 10 ¶ 78. <u>See also</u> ECF No. 29 Ex. 15 at 2 ("Check No. 502976").

offer any plausible, alternative explanation for why Defendant would pay

Plaintiff nearly $60,000.00 in excess consideration, if not to obtain the right

to construct a more extensive pipeline capable of transporting non-native

gas. Unfortunately, Mr. Schwoyer offered no viable answers.

"So what additional rights are they getting under the right-of-way

agreement, that they didn't have under the lease?" Mr. Mercer asked.

"That I can't answer," Mr. Schwoyer responded.[62] "Did you ever ask 'What

are they paying us 60,000 dollars for?'" "No," Mr. Schwoyer said.[63] Mr.

Mercer repeatedly asked, "Did you ever consider 'Wait a minute, we are

getting 60,000 dollars here, maybe they are getting something other than

what they already had the right to do under the lease?'" and "They

weren't getting any additional rights under your view than they had

under the lease. But they were paying you 59,000 plus dollars for it?"[64] In

the Court's view, Plaintiff has failed to adequately address this critical

question.

---

[62]   ECF No. 36 Ex. 10 at 157 (D. Schwoyer Dep. 157:15–18).

[63]   ECF No. 36 Ex. 10 at 157 (D. Schwoyer Dep. 157:19–21).

[64]   ECF No. 36 Ex. 10 at 157, 158 (D. Schwoyer Dep. 157:22–25, 158:10–12).

The 2010 right-of-way agreement also contained the following map of the proposed pipeline, depicted as Figure 1 below:

**Figure 1. Map of Proposed Pipeline from 2010 Right-of-Way Agreement**



The proposed pipeline is depicted as the thick black and white route beginning at the northcentral portion of the map and running south toward the center of the map, before continuing in a southeasterly direction toward the eastern boundary of the map. A second portion of the proposed pipeline, what the parties refer to as the "spur" line, is depicted connecting to the main portion of the pipeline near the center of the map and thereafter moving across the leased premises in a southwesterly direction.[65]

During Plaintiff's Rule 30(b)(6) deposition, Mr. Mercer asked Mr. Schwoyer to indicate on the map the location of the two well pads at issue with a capital letter "P."[66] The first well pad, at the southwestern corner of the diagram, was a proposed or planned well pad.[67] It was never built and in fact, the spur portion of the pipeline was never constructed.[68] Moving eastward, the second well pad, which existed at the time, is denoted

---

[65] See ECF No. 36 Ex. 10 at 142 (D. Schwoyer Dep. 142:19–22).

[66] See ECF No. 36 Ex. 10 at 143 (D. Schwoyer Dep. 143:15–25).

[67] See ECF No. 36 Ex. 10 at 143 (D. Schwoyer Dep. 143:06–08).

[68] See ECF No. 36 Ex. 5 at 7 ¶ 42. ECF No. 40 at 9 ¶ 42.

immediately below that portion of the main pipeline that would connect

with the spur section of the pipeline.[69]

The parties do not dispute that if the pipeline and pads were

constructed as depicted on the above map, it would not be possible for gas

to flow through both sections (the main and the spur sections)

simultaneously while only transporting domestic gas.[70] This is true

because it is not possible for gas to flow in both a northward and

southward direction through the pipeline at the same time.[71] Defendant

contends that this consequence renders Plaintiff's argument as to the

continued applicability of the lease addendum's domestic-gas-only

provision (Paragraph 12) incompatible with the reality of the parties' 2010

right-of-way agreement.[72]

---

[69]   See ECF No. 36 Ex. 10 at 143 (D. Schwoyer Dep. 143:11–17).

[70]   ECF No. 29 at 15 ¶¶ 81–82. ECF No. 38 at 10–11 ¶¶ 81–82.

[71]   ECF No. 29 at 15 ¶ 83. ECF No. 38 at 11 ¶ 83.

[72]   ECF No. 29 at 14 ¶ 80.

### E.   Camp Ne'er Too Late and SWEPI, LP, negotiate and execute the 2011 amendment to the 2010 right-of-way agreement.

On December 31, 2010, Defendant acquired the rights to the lease and lease addendum, as well as the 2009 and 2010 right-of-way agreements.[73] Thereafter, Plaintiff and Defendant began negotiating an amendment to the 2010 right-of-way agreement.[74] At this time, Plaintiff still was unrepresented during negotiations and drafting of the pertinent agreement.[75] That amendment was executed on December 2, 2011.[76] Plaintiff was paid $104,220.00 for executing the 2011 amendment, $99,220.00 of which was in consideration for the amendment and $5,000.00 of which was for the replanting of trees taken from the right-of-way.[77]

The purpose of the 2011 amendment was to expand the width of the 2010 right-of-way.[78] It states that "[e]xcept as provided in this Amendment, all of the terms and provisions of the [2010 right-of-way agreement]

---

[73]   ECF No. 29 at 16 ¶ 86. ECF No. 38 at 11 ¶ 86.

[74]   ECF No. 29 at 16 ¶ 88. ECF No. 38 at 11 ¶ 88.

[75]   ECF No. 36 Ex. 10 at 217 (D. Schwoyer Dep. 217:01–05).

[76]   ECF No. 29 at 16 ¶ 88. ECF No. 38 at 11 ¶ 88.

[77]   ECF No. 29 at 17 ¶¶ 97–98. ECF No. 38 at 12 ¶¶ 97–98.

[78]   ECF No. 29 at 16 ¶ 90. ECF No. 38 at 11 ¶ 90.

remain in full force and effect."[79] The 2011 amendment is a fully integrated

contract, and nothing in the 2011 amendment specifically references

Paragraph 12 of the lease addendum.[80] Even though Plaintiff was never

told by Al Wichter, the landman with whom its representatives now

negotiated, that Defendant would definitely drill eleven wells on the

property within a prescribed period of time, Plaintiff suggests that Mr.

Wichter represented during negotiations that Defendant was going

forward with such plans.[81] The 2011 amendment, however, is silent as to

those purported plans.[82]

　　　In connection with the 2011 amendment, Robert Schwoyer signed

three maps. Mr. Schwoyer made and initialed next to several "X" marks on

both of the December 2, 2011, maps which indicated that those were things

to which Plaintiff was not agreeing.[83] The parties agree that by signing the

---

[79]   ECF No. 38 Ex. 10 at 2 ¶ 4 ("Amendment to Pipeline Right of Way
    Agreement").

[80]   ECF No. 29 at 16–17 ¶¶ 90, 96. ECF No. 38 at 11–12 ¶¶ 90, 96.

[81]   ECF No. 29 at 17 ¶ 93. ECF No. 38 at 11 ¶ 93.

[82]   ECF No. 38 Ex. 10.

[83]   ECF No. 29 at 18 ¶ 104. ECF No. 38 at 13 ¶ 104.

two December 2, 2011 maps, Mr. Schwoyer was approving the location of the pipeline.[84] Though Defendant contends Mr. Schwoyer was approving the final version of the pipeline, Plaintiff suggests Mr. Schwoyer was approving the location of the pipeline "at that time."[85]

Significantly, however, on January 25, 2012, Robert Schwoyer signed a third map, which is noted in his own handwriting at the top of the page and in preprinted text in the legend box, as the "final" version of the pipeline's layout.[86] Again, the parties dispute whether Mr. Schwoyer's adoption of this map approved the final location of the pipeline or merely approved the location of the pipeline as it then stood.[87] Nevertheless, the parties do not dispute that the January 25, 2012 map no longer depicts the portion of the pipeline that would connect the well on the property to the

---

[84]   ECF No. 29 at 18–19 ¶¶ 103–05. ECF No. 38 at 13 ¶¶ 103–05.

[85]   ECF No. 29 at 19 ¶ 105. ECF No. 38 at 13 ¶ 105.

[86]   ECF No. 29 at 20 ¶ 112. ECF No. 38 at 13 ¶ 112. Plaintiff's answer to Defendant's statement of fact ¶ 112 is non-responsive. Defendant's statement of fact ¶ 112 is therefore deemed as admitted. See also ECF No. 29 Ex. 22 ("Final South"/"Final Property").

[87]   ECF No. 29 at 20 ¶ 113. ECF No. 38 at 13 ¶ 113.

greater pipeline infrastructure.[88] Without that connection line, the parties

also do not dispute that gas could not be carried from any well on

Plaintiff's property.[89]

A visual comparison of the 2011 and 2012 maps, taken from

Defendant's supporting brief and annotated by Defendant are shown

below as Figure 2:

**Figure 2. Comparison of the 2011 and 2012 Amendment Maps**[90]



Dec. 2011 map showing connection line. SOF 108.



Jan. 2012 map showing connection line eliminated. SOF 114.

---

[88]   ECF No. 29 at 20 ¶ 114. ECF No. 38 at 14 ¶ 114.

[89]   ECF No. 29 at 20 ¶ 115. ECF No. 38 at 14 ¶ 115.

[90]   ECF No. 37 at 21.

**F.      Plaintiff enters into the 2012 surface use agreement with Defendant. Thereafter, Defendant constructs the pipeline.**

On February 13, 2012, Plaintiff entered into a surface use agreement with Defendant.[91] The purpose of this agreement was to allow Defendant to store equipment and supplies on the well pad on the subject premises during construction of the pipeline.[92] Plaintiff's representatives never discussed why Defendant would need the agreement to use the well pad if the lease already covered such rights.[93] Plaintiff received $33,600.00 in additional consideration for allowing Defendant to use the well pad to store equipment and supplies for a six-month period.[94]

Shortly thereafter, construction on the pipeline began. Robert Schwoyer lives next door to the subject property, and he admits that during construction he visited the property almost every day.[95] By October 1, 2012, the pipeline project was complete and only non-native gas

---

[91]   ECF No. 29 at 21 ¶ 116. ECF No. 38 at 14 ¶ 116.

[92]   ECF No. 29 at 21 ¶ 117. ECF No. 38 at 14 ¶ 117.

[93]   ECF No. 29 at 21 ¶ 118. ECF No. 38 at 15 ¶ 118.

[94]   ECF No. 29 at 21 ¶ 119. ECF No. 38 at 15 ¶ 119.

[95]   ECF No. 29 at 22 ¶¶ 122–23. ECF No. 38 at 15 ¶¶ 122–23.

was flowing through the pipeline.[96] At that, time Plaintiff was aware that the only well on the property was not connected to the pipeline, rendering that well "shut-in."[97] Moreover, the "spur line" section of the pipeline had not been constructed.[98] Yet, Plaintiff contends that it was "under the impression" that further pipeline construction and well development would be completed.[99]

Under the Lease, Plaintiff was to receive yearly shut-in payments of $1,150.00 when a well was drilled and shut-in on the Property.[100] The parties do not dispute that Plaintiff has received the shut-in payments required by the lease.[101] On November 6, 2013, Plaintiff cashed the first shut-in check.[102] At the time that Plaintiff cashed the first shut-in check, it was aware for more than a year that gas was flowing through the pipeline but that no portion of that gas was produced from any wells on the leased

---

[96]   ECF No. 29 at 22 ¶ 124. ECF No. 38 at 15 ¶ 124.

[97]   ECF No. 29 at 22 ¶ 125. ECF No. 38 at 15 ¶ 125.

[98]   ECF No. 29 at 22 ¶¶ 125–27. ECF No. 38 at 15 ¶¶ 125–27.

[99]   ECF No. 38 at 15 ¶¶ 125–26.

[100]   ECF No. 38 at 16 ¶ 129. See also ECF No. 29 Ex. 8 at ¶ 12 ("Shut-in Royalty").

[101]   ECF No. 29 at 23 ¶ 130. ECF No. 38 at 16 ¶ 130.

[102]   ECF No. 29 at 23 ¶ 131. ECF No. 38 at 16 ¶ 131.

premises or pooled properties.[103] Plaintiff contends that it still remained

"under the impression" that further work on the pipeline needed to be

completed prior to the drilling of additional wells on its property.[104]

Plaintiff has returned subsequent shut-in checks to Defendant.[105]

### G. Plaintiff sends Shell the October 1, 2013 "Shattered Dreams" Letter.

On October 1, 2013, one month before cashing the shut-in check,

David Schwoyer, Sr., provided Robert A. Schwoyer a letter, which Robert

A. Schwoyer sent to Shell on behalf of Plaintiff.[106] During his deposition,

David Schwoyer admitted that the letter "was written by [David

Schwoyer] and Robert Schwoyer" and that the facts in the letter "came

from [David Schwoyer] as well as from [Robert Schwoyer]."[107]

"[W]e now find ourselves at a loss," the Schwoyers, on behalf of

Plaintiff, wrote.[108] Many of their neighbors have "similar" stories, but each

---

[103]   ECF No. 29 at 23 ¶ 132. ECF No. 38 at 16 ¶ 132.

[104]   ECF No. 38 at 16 ¶ 132.

[105]   ECF No. 38 at 16 ¶ 132.

[106]   ECF No. 29 Ex. 24.

[107]   ECF No. 36 Ex. 10 at 215 (Schwoyer Dep. 215:07–14).

[108]   ECF No. 29 Ex. 24 at2.

"have their own disappointments."[109] Among other admissions, the letter

acknowledges that Plaintiff has been aware that since the end of June 2010,

"Shell drilled and capped the well and all activities since then have

completely ceased on the pad and well site."[110] The letter also indicates

that at the time of its writing, Plaintiff's members were aware that "[t]he

pipeline has been in place for over a year and as far as we know it is fully

operational."[111]

     "[I]t has been over a year since the pipeline was completed and there

ha[s] been no further communications to us from Shell regarding this

matter," the letter continues.[112] In fact, Plaintiff admits in the letter to being

informed by a Shell representative in May 2013 that "our location was not

on the fracking schedule for this year (2013)."[113] The letter indicates that in

---

[109]  Id.

[110]  Id. at 3.

[111]  Id. at 4.

[112]  Id.

[113]  Id.

late May 2013, a representative for Plaintiff was "informed [ ] that Shell

had no intentions of doing anything else at our location."[114]

The whole situation resulted in "shattered dreams," Plaintiff's letter

suggests. "We hope that after reading our story 'that someone in your

organization' has the courtesy, ethical value and integrity, to finally tell us

what the true plans if there are any regarding our location."[115] "Even with

all this we still have some partial dream that Shell will live up to the

written and verbal commitments East and Shell have made with our

organization over the past 5 years to expand our pad, drill and frack the

wells as stated."[116] It does not appear from the record that Defendant

responded to Plaintiff's letter.[117]

> **H.   Plaintiff initiates this civil action. Defendant files a timely Motion for Summary Judgment, but Plaintiff files a late Motion for Summary Judgment, even after receiving an extension from the Court.**

---

[114]   <u>Id.</u> at 5.

[115]   <u>Id.</u>

[116]   <u>Id.</u>

[117]   Defendant is a general partner of Shell Energy Holding GP, LLC. ECF No. 9 at 1 ¶ 3.

On July 30, 2014, Plaintiff initiated this litigation in the Court of

Common Pleas of Tioga County, Pennsylvania, seeking injunctive and

monetary relief for the alleged breach of contract.[118] Defendant was served

on August 5, 2014. On September 2, 2014, Defendant properly removed the

action to this Court.[119]

The dispositive motions deadline of August 7, 2015 was set by Order

of this Court on June 25, 2015.[120] On August 7, 2015, Defendant filed the

instant Motion for Summary Judgment, but Plaintiff filed no dispositive

motions.[121] On August 10, 2015, three days after the deadline had passed,

Plaintiff filed a motion seeking an extension of time to file a dispositive

---

[118] ECF No. 1 & Ex. 1.

[119] Removal was appropriate under 28 U.S.C. § 1441(b), as this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Each of Plaintiff's general partners is a citizen of Pennsylvania or Florida. Therefore, Plaintiff is also a citizen of Pennsylvania and Florida. Defendant is a citizen of Delaware and Texas. Plaintiff's Complaint seeks monetary damages "greater than $50,000.00." ECF No. 9 at 6. Plaintiff also seeks injunctive relief. Id. Making a reasonable, independent valuation of the relief sought, this Court is satisfied that 28 U.S.C. § 1332(a)'s $75,000.00 statutory minimum amount-in-controversy has been met here. See also ECF No. 1 at 3–4.

[120] ECF No. 27.

[121] ECF No. 28.

motion, which Defendant opposed.[122] Notwithstanding Defendant's

opposition, this Court granted Plaintiff leave to file a dispositive motion

"no later than August 28, 2015 at 5:00 p.m."[123] The Court made clear that

this was a "strict deadline" and that "no further extensions of time will be

granted."[124] Plaintiff filed the instant Motion for Summary Judgment on

August 28, 2015 at 5:16 p.m., sixteen minutes late.[125]

Because there is no genuine dispute of material fact that the 2010

right-of-way agreement fails to incorporate Paragraph 12 of the lease

addendum, Defendant committed no breach by transporting non-native

gas through the subject pipeline. Therefore, I will enter judgment in favor

of Defendant in accordance with the following reasoning.

---

[122]   ECF Nos. 30–31.

[123]   ECF No. 32 at 5. ECF No. 33.

[124]   ECF No. 32 at 5. ECF No. 33.

[125]   ECF No. 36 (Receipt: Notice of Electronic Filing). Therefore, in addition to the foregoing reasons, Plaintiff's Motion for Summary Judgment could be denied on the independent ground that is was untimely filed. Tardiness has been described as the "quintessential discourtesy." In re Lokuta, 964 A.2d 988, 1005 (Pa. Ct. Jud. Disc. 2008). It evidences "disrespect for the judicial system itself" as well as for those who play by the rules. See id.

## II.   LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[126] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[127] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[128]

"A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[129] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to

---

[126]   Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

[127]   Fed. R. Civ. P. 56(a).

[128]   Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) and Celotex Corp., 477 U.S. at 322).

[129]   Clark v. Modern Grp. Ltd., 9 F.3d at 326.

show all elements of a <u>prima facie</u> case under applicable substantive

law."[130]

"[T]he inquiry involved in a ruling on a motion for summary

judgment or for a directed verdict necessarily implicates the substantive

evidentiary standard of proof that would apply at the trial on the

merits."[131] Thus, "[i]f the defendant in a run-of-the-mill civil case moves

for summary judgment or for a directed verdict based on the lack of proof

of a material fact, the judge must ask himself not whether he thinks the

evidence unmistakably favors one side or the other but whether a fair-

minded jury could return a verdict for the plaintiff on the evidence

presented."[132] "The mere existence of a scintilla of evidence in support of

the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff."[133] "The judge's

inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon

---

[130]  <u>Id.</u>

[131]  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 252.

[132]  <u>Id.</u>

[133]  <u>Id.</u>

which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[134]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[135] "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[136]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because

---

[134] Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson, 81 U.S. 442, 447 (1871)).

[135] Celotex Corp., 477 U.S. at 323 (internal quotations omitted).

[136] Id.

they may reasonably be resolved in favor of either party."[137] For movants

and nonmovants alike, the assertion "that a fact cannot be or is genuinely

disputed" must be supported by: (i) "citing to particular parts of materials

in the record" that go beyond "mere allegations"; (ii) "showing that the

materials cited do not establish the absence or presence of a genuine

dispute"; or (iii) "showing . . . that an adverse party cannot produce

admissible evidence to support the fact."[138]

  "When opposing summary judgment, the non-movant may not rest

upon mere allegations, but rather must 'identify those facts of record

which would contradict the facts identified by the movant.'"[139] Moreover,

"[i]f a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule

56(c), the court may . . . consider the fact undisputed for purposes of the

motion."[140] On motion for summary judgment, "[t]he court need consider

---

[137]  Liberty Lobby, Inc., 477 U.S. at 250.

[138]  Fed. R. Civ. P. 56(c)(1).

[139]  Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[140]  Fed. R. Civ. P. 56(e)(2).

only the cited materials, but it may consider other materials in the record."[141]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[142] "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[143] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[144]

## III.   ANALYSIS

In accordance with the following reasoning, I hold that Plaintiff has standing to sue because it was a signatory to the 2010 right-of-way agreement, which Plaintiff alleges conditionally incorporates Paragraph 12 of the 2008 lease addendum.

---

[141] Fed. R. Civ. P. 56(c)(3).

[142] Liberty Lobby, Inc., 477 U.S. at 249.

[143] Id.

[144] Id. at 249–50 (internal citations omitted).

Reaching the merits, I further hold that summary judgment is appropriately granted in Defendant's favor because there is no genuine dispute of any material fact that the 2010 right-of-way agreement fails to incorporate Paragraph 12 of the lease addendum and that the Defendant therefore did not breach the 2010 right-of-way agreement by constructing a pipeline that transported non-native gas.

In addition, I hold that Plaintiff's course of conduct here is sufficient to conclude that it waived any expectation or right it had preserve the domestic gas limitation in its subsequent dealings with Defendant and is thereby estopped from now asserting such a claim.

**A.    Plaintiff Has Standing To Sue Because It Was A Signatory To The 2010 Right-Of-Way Agreement, Which Plaintiff Alleges Conditionally Incorporates Paragraph 12 Of The 2008 Lease Addendum. The Course Of The Parties' Subsequent Dealings Confirms This Conclusion.**

As a preliminary matter, Defendant argues that Plaintiff lacks standing to sue for breach of the lease. This must be the case, Defendant contends, because Plaintiff was not a signatory to or an intended third party beneficiary of the lease, and thereafter Plaintiff was never properly assigned any rights under the lease.

Specifically, as the parties' statements of fact recount, the lease was executed on June 17, 2008 between the not-for-profit organization Ne'er Too Late Lodge and SWEPI's predecessor-in-interest, East Resources, Inc.[145] Though the validity of the assignment of rights from East Resources, to East Resources Management, and ultimately to SWEPI is uncontested, Defendant takes issue with the purported transfer of rights that occurred between Ne'er Too Late Lodge and Camp Ne'er Too Late, LP.

Defendant's challenge centers on the two inconsistent transactions that transpired after Ne'er Too Late Lodge signed the lease. Specifically, on November 14, 2008, five months after the lease was executed, Ne'er Too Late Lodge assigned all of its rights under the lease to its individual shareholders.[146] As part of the assignment, each of Ne'er Too Late Lodge's nine shareholders accepted an interest in the rights under lease in

---

[145]   ECF No. 29 at 4 ¶ 16. ECF No. 38 at 3 ¶ 16.

[146]   ECF No. 29 at 3 ¶ 11. ECF No. 38 at 2 ¶ 11.

proportion to their ownership share in Ne'er Too Late Lodge.[147] That

assignment was never recorded.[148]

Approximately eighteen months later in April 2010, those same nine

shareholders of Ne'er Too Late Lodge formed Camp Ne'er Too Late, LP.[149]

Curiously, Ne'er Too Late Lodge, on August 2, 2010, once again assigned

its rights under the lease, this time to Camp Ne'er Too Late.[150] Unlike the

first assignment of the lease rights to Ne'er Too Late Lodge's shareholders,

this subsequent assignment was recorded in the Recorder of Deeds Office

of Tioga County, Pennsylvania.[151]

---

[147]   ECF No. 29 Ex. 3 at 3.

[148]   ECF No. 29 at 3 ¶ 12. ECF No. 38 at 2 ¶ 12.

[149]   ECF No. 29 Ex. 1. Although Plaintiff has provided the percentage of each shareholder's capital contribution to Ne'er Too Late Lodge, I agree with Defendant that the issue of whether the supplied ownership breakdown of Camp Ne'er Too Late, LP, is identical to that of Ne'er Too Late Lodge (and consequently, that of the November 2008 assignment) is unresolved on the present record. ECF No. 29 Ex. 1 at 23.

[150]   ECF No. 29 at 3 ¶ 13. ECF No. 38 at 2 ¶ 13.

[151]   Id. See also ECF No. 29 Ex. 5. Neither party discusses the potential that the November 2008 transfer, not having been recorded, would have fallen second in priority as to the August 2010 recorded assignment or the result such dynamic would have had upon the standing issue.

As fully recited in the facts section above, Plaintiff has stipulated that the August 2010 assignment assigned to the Camp Ne'er Too Late only those rights that remained after the November 2008 assignment to the individual shareholders of Ne'er Too Late Lodge.[152] Thus, the parties agree that the individual shareholders—and not Camp Ne'er Too Late—were the actual assignees of the Ne'er Too Late Lodge's rights under the lease.[153]

The lease rights having vested to the individual shareholders, Defendant points out that at no time did the individual shareholders either: (i) convey those rights back to Lodge before Lodge assigned them to Camp or (ii) assign them directly to Camp.[154] Accordingly, as Defendant would have it, Plaintiff does not have standing to enforce any rights pursuant to the lease executed between Defendant's predecessor-in-interest and Ne'er Too Late Lodge, because Plaintiff never received an assignment of those rights in full.

---

[152]  ECF No. 38 at 2 ¶ 13.

[153]  <u>Id.</u>

[154]  ECF No. 29 at 3 ¶¶ 14–15. ECF No. 38 at 2–3 ¶¶ 14–15.

Plaintiff's primary argument to the contrary is that Defendant has

overlooked the fact that although Plaintiff was not a party to the original

lease and lease addendum, it was a party to the 2010 right-of-way

agreement. Because the addendum to the 2010 right-of-way agreement

references the lease and lease addendum, Plaintiff contends that it does

have the requisite standing to pursue the instant claim.[155]

In my view, the standing dispute in this matter essentially boils

down to the following question: Does a signatory to an agreement have

standing to advance a breach of contract claim by alleging that the

disputed agreement incorporates unfulfilled provisions of an earlier

---

[155] Plaintiff also contends that the standing dispute could be resolved on a different basis, namely, that the partners of Camp Ne'er Too Late, LP, made initial contributions equivalent to their proportionate stake in the lease. Although Plaintiff has provided the percentage of each shareholder's capital contribution to Lodge, I agree with Defendant that the issue of whether the supplied ownership breakdown of Camp Ne'er Too Late, LP is identical to that of Ne'er Too Late Lodge (and consequently, that of the November 2008 assignment) is unresolved on the present record, as the Court has only been provided with the initial capital contribution breakdown but not with the proportions of ownership as they relate to the rights under the lease. See ECF No. 29 at 3 ¶ 13. ECF No. 38 at 2 ¶ 13. Compare ECF No. 29 Ex. 1 at 23 (listing ownership percentages), with ECF No. 29 Ex. 3 (listing no ownership percentages).

agreement to which the plaintiff was not a signatory? The answer, according to Pennsylvania contract law and everyday practice, is yes.[156]

Although I agree with Plaintiff on its standing to bring the instant suit, I find it important to note that its success on this issue comes at a very narrow margin. Specifically, the outcome would likely be different if the parties here had never executed the subsequent right-of-way agreements, and Plaintiff was forced to bring its claim directly under the lease or its addendum. In that sense, this case is much more focused upon interpretation of the 2010 right-of-way agreement's addendum than it is upon so analyzing the terms of the initial lease. Because of that, Plaintiff possesses a sufficient basis to proceed with this action.

At this juncture, however, it is also important to recognize that the outcome of the standing issue in Plaintiff's favor is not determinative as to the merits of its claim. The issues of standing and breach in this dispute, though similar in some respects, are necessarily distinct as a matter of law.

---

[156] "A federal court sitting in diversity must apply state substantive law and federal procedural law." <u>Chamberlain v. Giampapa</u>, 210 F.3d 154, 158 (3d Cir. 2000) (citing <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 78 (1938) (Brandeis, J.)).

The issue of standing is a preliminary one, resolvable by a federal court at the outset of its disposition and before reaching the merits. As the United States Court of Appeals for the Third Circuit has observed in an analogous context, "our determination of the likelihood of success on the merits of the case is a separate inquiry from the threshold issue of Article III standing. To demonstrate its standing to sue, a plaintiff must only <u>allege</u> that they have suffered sufficient injury to comply with Article III's 'case or controversy' requirement."[157]

That is to say, although Plaintiff has standing to sue for a breach of the 2010 right-of-way agreement by alleging a derivative breach of the lease addendum, it still must establish that the pertinent provision on which it relies, Paragraph 12 of the lease addendum, was clearly incorporated into the 2010 right-of-way agreement and thereafter violated. In that sense, because the contested provision was alleged to have been incorporated into the 2010 right-of-way agreement in conditional fashion, Plaintiff must first prove that the conditions necessitating such

---

[157]   <u>The Pitt News v. Fisher</u>, 215 F.3d 354, 360 (3d Cir. 2000) (Nygaard, J.).

incorporation were actually satisfied. This is the determination to which the Court turns in Part III.B.

"The requirement of standing under Pennsylvania law is prudential in nature, and stems from the principle that judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract."[158] "A party has standing to bring a cause of action if it is 'aggrieved' by the actions complained of, that is, if its interest in the outcome of the litigation is substantial, direct, and immediate."[159] "A 'substantial' interest is one that surpasses the common interest of all citizens in procuring obedience to the law."[160] "A 'direct' interest requires a showing that the matter complained of caused harm to the party."[161] "An 'immediate' interest involves the nature of the causal connection, see id., and signifies that judicial intervention is ordinarily inappropriate when the

---

[158] <u>City of Phila. v. Commonwealth,</u> 575 Pa. 542, 559, 838 A.2d 566, 577 (2003).

[159] <u>City of Phila. v. Schweiker,</u> 579 Pa. 591, 604, 858 A.2d 75, 83 (2004).

[160] <u>Hosp. & Healthsystem Ass'n of Pa. v. Com.,</u> 621 Pa. 260, 279, 77 A.3d 587, 599 (2013) (internal citations omitted).

[161] <u>Id.</u>

harm alleged is remote and speculative."[162] Thus, "[s]tanding requires a

party to have a substantial interest in the subject matter of the litigation;

the interest must be direct; and the interest must be immediate and not a

remote consequence."[163]

In ACTEGA Kelstar, Inc. v. Musselwhite, for instance, the United

States District Court for the District of New Jersey interpreted New Jersey

state contract law, which closely tracks Pennsylvania law on the issue of

enforcement by non-signatories.[164] The court in ACTEGA addressed

whether a plaintiff corporation that did not sign an original employment

contract could enforce a restrictive covenant in that contract solely as a

result of that corporation having executed an amended agreement that

incorporated the contested restrictive covenants.[165] The court held that it

could. "[T]hat Plaintiff was not a party to the original employment

agreement does not prevent Plaintiff from seeking to enforce the restrictive

---

[162] Id.

[163] In re Trust Under Deed of Green, 2001 PA Super 186, ¶ 17, 779 A.2d 1152, 1157 (2001) (quoting Ken R. on Behalf of C.R. v. Arthur Z., 546 Pa. 49, 682 A.2d 1267, 1270 (1996)).

[164] No. CIV. 09-1255(RBK/JS), 2009 WL 1794793, at *3 (D.N.J. June 22, 2009).

[165] Id.

covenants," the court confirmed, since "Plaintiff is a party to the Amendment, in which Defendant expressly agreed that he would be bound by the restrictive covenants in the [original] contract."[166]

Furthermore, in a related setting, the Supreme Court of Pennsylvania has recognized that the creditor of a trust who was not named in the trust's originating documents may nevertheless compel an accounting of such trust if the creditor later enters into agreements premised upon the trust's creation. "Although appellant was not a party to the original agreement," the Supreme Court of Pennsylvania wrote, "subsequent to its date, and after the execution of the deed, he entered into an extension agreement which recognized the status of affairs created by the trust deed and its incorporated agreement."[167]

Miller v. Butler, a matter before the United States District Court for the District of New Jersey, involved a breach of contract suit brought by an individual investor against an investment fund that had been organized as

---

[166] Id.

[167] In re Wheeler's Estate, 287 Pa. 416, 418, 135 A. 252, 252 (1926).

a limited liability company.[168] <u>Miller</u> confirms that courts may find

adequate standing in contract disputes where the plaintiffs themselves

contributed the contested property, even if those plaintiffs were not parties

to the underlying contract. In that case, the individual plaintiff was not a

member of the defendant limited liability company, but a separate limited

liability company that he owned was a member.[169] The defendant limited

liability company raised the issue of standing as to plaintiff's breach of

contract claim, as the plaintiff personally was not a signatory to the

defendant's operating agreement.[170] The district court rejected that

argument and reasoned that "Plaintiff has standing since the funds to

purchase the [contested fund] were transferred by and from him."[171]

Turning to the instant matter, recall that the final version of the

introductory paragraph of the addendum to the 2010 right-of-way

agreement reads as follows:

---

[168]  No. 1:12-CV-01004 RBK/JS, 2012 WL 5868962, at *2 (D.N.J. Nov. 16, 2012).

[169]  <u>See</u> <u>id.</u>

[170]  <u>Id.</u>

[171]  <u>Id.</u>

> This addendum is attached to and made part of that certain Right of Way Agreement dated <u>October 19, 2010.</u> If any of the following provisions conflict with or are inconsistent with any of the printed provisions or terms of the Right of Way Agreement or Original Oil and Gas Lease and Addendum the following provisions, and the non conflicting terms of the Original Oil and Gas Lease and its Addendum, shall control and be deemed to supersede the printed terms of the Right of Way Agreement.[172]

Considering the above language in light of the foregoing authorities, I would find that Plaintiff has adequately established standing to pursue its claims here, since it was party to subsequent agreements that allegedly incorporated the contested provisions. In this manner, Plaintiff enjoys standing not directly via the lease and addendum but derivatively as a signatory to subsequent amendments that referenced those documents and contemplated conditional incorporation of certain of the documents' terms.

By way of example, contemplate the scenario in which the second sentence of the above-quoted paragraph from Plaintiff's 2010 right-of-way agreement began not with "If any of the following provisions conflict with or are inconsistent with any of the printed provisions or terms of the Right

---

[172]   ECF No. 29 at 10–11 ¶ 59. ECF No. 38 at 6 ¶ 59. <u>See also</u> ECF No. 29 Ex. 12 at 5 ("Addendum").

of Way Agreement or Original Oil and Gas Lease and Addendum" but

with "If any of the following provisions conflict with or are inconsistent

with any of the printed provisions or terms of the 2008 Merger Agreement

between Company A, Inc., and Company B., Inc." or with "If any of the

following provisions conflict with or are inconsistent with any of the

printed provisions or terms of the 2008 Right-of-Way Agreement between

Tioga County, Pennsylvania Landowner John Doe and SWEPI, LP."

I hardly think that whether Plaintiff here was a party to the

hypothetical 2008 Merger Agreement or the hypothetical 2008 Right-of-

Way Agreement in Tioga County makes any difference in the

determination of whether Plaintiff would have standing to sue for a breach

of the hypothesized right-of-way agreements. Those terms are effected in a

derivative rather than a direct sense, but they do not preclude Plaintiff

from suing based upon the agreement it did in fact sign.

In addition, courts interpreting common law contract principles

agree that "a party may adopt and be bound to a contract to which it was

not originally a signatory."[173] Such construction is particularly apt where the "plaintiff had not been created at the time the agreement was drafted and signed" but "had an explicit relationship" to the agreement.[174] "There are no magic words to explicitly adopt a contract."[175] "Third parties to a contract become parties who are bound by the contract's terms by either explicitly or implicitly adopting the agreement."[176]

"Express adoption occurs when a successor adopts a contract of a predecessor as its own."[177] "Implicit adoption occurs when a party accepts benefits intended for third party beneficiary."[178] "Courts will often find implicit adoption when a party who has received benefits of a contract then tries to avoid burdens imposed by the same contract."[179]

---

[173] Am. Legacy Found. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 640 F. Supp. 2d 524, 538 (D. Del. 2009), aff'd sub nom Am. Legacy Found., RP v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 623 F.3d 135 (3d Cir. 2010).

[174] See id.

[175] In re Fed.-Mogul Glob., Inc., 526 B.R. 567, 576 (D. Del. 2015).

[176] Id.

[177] Id.

[178] Id.

[179] Id.

Relatedly, contracts may be implied from the course of the parties'

conduct. For instance, "as a result of plaintiff's actions, statements, and the

benefits it received as a direct result of the [agreement], the [agreement]

can be held to be an implied in fact contract as it relates to plaintiff." [180]

"An implied in fact contract has the legal equivalency of an express

contract."[181] As the Superior Court of Pennsylvania has concluded, "[a]

contract implied in fact can be found by looking to the surrounding facts of

the parties' dealings."[182] "Implied contracts . . . arise under circumstances

which, according to the ordinary course of dealing and the common

understanding of men, show a mutual intention to contract."[183]

The Third Circuit has explained that application of such doctrines,

like those of adoption, equitable estoppel, and implied-in-fact contracts,

"prevent[s] a non-signatory from embracing a contract, and then turning

---

[180] Id. n. 33.

[181] Id.

[182] Tyco Elecs. Corp. v. Davis, 2006 PA Super 64, ¶ 3, 895 A.2d 638, 640 (2006).

[183] Id.

its back on the portions of the contract . . . that it finds distasteful."[184] In

line with these common law contract principles, the particular course of

dealing here compels the conclusion that Plaintiff has standing to sue

based upon its allegations that certain of the lease addendum's provisions

were incorporated into the 2010 right-of-way agreement and thereafter

violated.

For instance, Defendant does not contest that after Plaintiff was

formed, several negotiations between Plaintiff and Defendant were held

with the purpose of agreeing to several right-of-way agreements.[185] Those

negotiations between Plaintiff and Defendant resulted in two right-of-way

agreements, which although distinct, referenced the initial lease and

addendum.[186] Moreover, Defendant or its predecessor-in-interest East

Resources Management compensated Plaintiff $59,610.00 and $99,220.00,

respectively, in consideration for the 2010 and 2011 right-of-way

---

[184] E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d Cir. 2001) (Barry, J.).

[185] ECF No. 29 at §§ D–E (discussing the creation of the 2010 and 2011 Right-of-Way Agreements).

[186] See id.

- 56 -

agreements.[187] As Plaintiff suggests, Defendant "cannot have it both ways by alleging that Plaintiff entered into various fully integrated agreements, and was paid according to those agreements, including shut-in payments under the Lease, while also asserting that Plaintiff does not have standing to bring suit for breach of the Lease."[188]

I think it enough that both the text of the 2010 right-of-way agreement and the course of the parties' dealings afford Plaintiff standing and permit the Court to advance to the merits.

     **B.**     **Summary Judgment Is Appropriate In Favor Of Defendant Because There Is No Genuine Dispute Of Material Fact That The 2010 Right-Of-Way Agreement Fails To Incorporate Paragraph 12 Of The Lease Addendum And That The Defendant Therefore Did Not Breach The 2010 Right-Of-Way Agreement By Constructing A Pipeline That Transported Non-Native Gas.**

"The court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to

---

[187]  ECF No. 29 at 14 ¶ 78, 17 ¶ 98. ECF No. 29 at 10 ¶ 78, 12 ¶ 98.

[188]  ECF No. 39 at 4–5.

only one reasonable interpretation.'"[189] "Under Pennsylvania law, the Court must determine, as a matter of law, whether the relevant contract terms are ambiguous."[190] "If the contract is unambiguous, then it is for the Court to decide whether the contract was breached."[191]

Contract interpretation is an "attempt to ascertain the intent of the parties and give it effect," and "[w]hen the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement."[192] Where the words are ambiguous, on the other hand, "parol evidence is admissible to explain or clarify or resolve the ambiguity."[193]

---

[189] Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 164 (3d Cir. 2001) (quoting Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir.1999)). See also Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013) (Ambro, J.).

[190] Gen. Refractories Co. v. Fed. Ins. Co., No. CIV.A. 00-5508, 2001 WL 1580173, at *3 (E.D. Pa. Dec. 6, 2001)

[191] Id.

[192] LJL Transp., Inc. v. Pilot Air Freight Corp., 599 Pa. 546, 962 A.2d 639, 647 (2009).

[193] Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 588 Pa. 470, 905 A.2d 462, 469 (2006).

When determining whether the language of an agreement is clear or ambiguous, the Court assumes that the parties intend "all provisions in the agreement [to] be construed together and . . . given effect."[194] The "focus . . . is upon the terms of the agreement as <u>manifestly expressed</u>, rather than as, perhaps, silently intended."[195]

Accordingly, the Court assumes generally that the parties have given words their "commonly accepted and plain meaning," but also recognizes "that every agreement is made and to be construed with due regard to the known characteristics of the business to which it relates . . . and hence the language used in a contract will be construed according to its purport in the particular business, although this results in an entirely different conclusion from what would have been reached had the usual meaning been ascribed to those words."[196]

Interpretation is not concerned with the parties' "post hoc judgment[s] . . . as to what should have been," and the Court will not "rely

---

[194] <u>Id.</u>

[195] <u>Steuart v. McChesney</u>, 498 Pa. 45, 444 A.2d 659, 661 (1982).

[196] <u>Franklin Sugar Ref. Co. v. Howell</u>, 274 Pa. 190, 118 A. 109, 110 (1922).

upon a strained contrivancy" to establish ambiguity.[197] "The Court, rather,

seeks to be faithful to the meaning that the parties—given their positions at

the time of contracting—would have given their words <u>ex ante</u>."[198]

Moreover, "[t]he issue of whether a writing constitutes an integrated

contract is a question of law."[199] "A contract is integrated if it represents a

final and complete expression of the parties' agreement."[200] "Where a

contract purports to be a complete legal obligation without any doubt as to

its object or extent, it is presumed to reflect the whole legal right of the

parties."[201]

"[A] lease is in the nature of a contract and is controlled by

principles of contract law."[202] "It must be construed in accordance with the

---

[197] <u>Steuart</u>, 444 A.2d at 663.

[198] <u>Roe v. Chief Expl. & Dev. LLC</u>, No. 4:11-CV-00579, 2013 WL 4083326, at *5 (M.D. Pa. Aug. 13, 2013).

[199] <u>Lenzi v. Hahnemann Univ.</u>, 445 Pa. Super. 187, 195, 664 A.2d 1375, 1379 (1995) (citing <u>Murray v. University of Pennsylvania Hospital</u>, 340 Pa.Super. 401, 490 A.2d 839 (1985)).

[200] <u>Lenzi</u>, 445 Pa. Super at 195 (citing <u>McGuire v. Schneider, Inc.</u>, 368 Pa.Super, 344, 534 A.2d 115 (1987)).

[201] <u>Lenzi</u>, 445 Pa. Super at 195 (citing <u>McGuire</u>, 368 Pa.Super, at 344).

[202] <u>T.W. Phillips Gas & Oil Co. v. Jedlicka</u>, 615 Pa. 199, 208, 42 A.3d 261, 267 (2012) (internal citation omitted).

terms of the agreement as manifestly expressed, and the accepted and

plain meaning of the language used, rather than the silent intentions of the

contracting parties, determines the construction to be given the

agreement."[203]

"The best evidence of what parties to a written agreement intend is

what they say in their writing."[204] Thus, the Supreme Court of

Pennsylvania has acknowledged that if an agreement's words "are clearly

susceptible of but one interpretation," the scope of that agreement "must

be found in them alone."[205] "What ought to have passed . . . or what ought

to be understood as having passed, is never a question for a court, when

the grant itself, in words not to be misunderstood, states exactly what did

pass."[206] In cases of such clarity, "[t]he law will not imply a different

contract from that which the parties themselves made."[207]

---

[203]  Id. (internal quotation marks omitted).

[204]  Benihana of Tokyo, Inc. v. Benihana, Inc., 59 F. Supp. 3d 654, 660 (D. Del. 2014), aff'd, 622 F. App'x 169 (3d Cir. 2015) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002)).

[205]  Cubbage v. Pittsburg Coal Co., 216 Pa. 411, 414, 65 A. 797, 798 (1907).

[206]  Id.

[207]  Greek v. Wylie, 266 Pa. 18, 23, 109 A. 529, 530 (1920).

1.     **The lease and the subsequent right-of-way agreements are separate legal documents that constitute distinct agreements. Therefore, Plaintiff can prevail only if Paragraph 12 of the lease addendum was incorporated by the introductory paragraph of the addendum to the 2010 right-of-way agreement.**

As a starting point, I must determine whether the agreements at issue are appropriately viewed as separate writings constituting a single transaction or separate writings to be treated as distinct contractual agreements. The latter is more true to the factual backdrop in this case.

Even if there exists "a relationship between the work performed" under one agreement and that contemplated by another, the presumption, absent indication otherwise, is that they constitute "two separate contracts, not two separate writings that were to be construed as two parts of one contract."[208] This is true even if the two agreements "concern the same subject matter" or "are part of the same bargain."[209] A key consideration is

---

[208] <u>Capricorn Power Co. v. Siemens Westinghouse Power Corp.</u>, 324 F. Supp. 2d 731, 751 (W.D. Pa. 2004) (Gibson J.).

[209] <u>Id.</u> at 750–51.

whether, upon execution of one agreement, the parties "have established rights as between themselves."[210]

In discerning whether "two agreements, while related, were intended to be separate agreements," courts have considered the following factors:

(1)     whether the agreements were executed at different times;

(2)     whether the agreements related to different subject matters;

(3)     whether the agreements were not made between the same parties;

(4)     whether the agreements contained integration clauses;

(5)     whether one agreement could survive should the other be terminated;

(6)     whether the agreements were intended as consideration for one another;

(7)     whether the agreements contained different choice of law or dispute resolution provisions; and

(8)     whether subsequent amendments to one agreement have left similar provisions of the other agreement unchanged.[211]

---

[210] Id. at 751.

[211] In re AbitibiBowater Inc., 418 B.R. 815, 824 (Bankr. D. Del. 2009).

Considering all of the facts and circumstances applicable to the instant matter, I am satisfied that the original 2008 oil and gas lease with addendum was intended to function as an agreement distinct from the subsequent 2010 pipeline right-of-way and addendum. Despite the fact that the agreements were executed between the same parties (or their predecessors-in-interest) and concern the same general economic activity (natural gas drilling), the remainder of the circumstances that I have considered counsel for treating these agreements as distinct contracts.

Most apparently, the agreements were the result of several temporally distinct sets of negotiations, regarded several separate contractual rights, involved several forms of consideration paid, and ultimately resulted in several separate agreements, each with its own integration clause. Critically, the textual differences between the 2008 lease and the 2010 right-of-way agreement signal a distinction in the types of contractual rights each agreement bestowed upon Defendant. On one hand, the 2008 lease granted Defendant the right to drill and maintain wells on Plaintiff's property, while also constructing a pipeline to transport

native gas only. Two years later, however, the parties found it necessary to negotiate as to construction of a pipeline not only capable of carrying non-native gas, but also constructed with certain other geographic modifications than initially planned. One need only ask: if Plaintiff's well was to cease production, would Defendant be forced to tear up the existing stretch of pipeline on the leased premises, or <u>vice versa</u>? Clearly, the answer is no, not only in a theoretical sense, but also because that precise separation of such rights has already played itself out in this matter.

Plaintiff cites to <u>Southwestern Energy Production Co. v. Forest Resources, LLC</u>, which according to Plaintiff's opposition brief, stands for the proposition that "where several documents are made as part of one transaction, they will be read together and each will be construed with reference to the others even if the documents were executed at different times and do not in terms refer to each other."[212] That argument relies on a fallacious premise and would also otherwise requires the explicit

---

[212]  2013 PA Super 307, 83 A.3d 177 (2013). <u>See also</u> ECF No. 39 at 8.

incorporation of one document's terms into the second, which is not the case here.

The faulty premise inapplicable to this matter is that cases like Southwestern Energy rely on the disputed documents having been made "as part of one transaction."[213] Specifically, Southwestern Energy involved a dispute between an initial oil and gas lease and two subsequent letter agreements that explicitly amended certain terms of the original lease.[214] In Southwestern Energy, the Honorable Sallie Updyke Mundy of the Superior Court of Pennsylvania made clear that "by their own terms," the agreements at issue "reference and incorporate each other with the clear intent they should be interpreted as a single agreement."[215] Quite opposite from the facts at hand, one of the two subsequent lease amendments in Southwestern Energy even "identifie[d] itself as an amendment of the

---

[213]   ECF No. 39 at 8.

[214]   Southwestern Energy, 83 A.3d at 181.

[215]   Id. at 187.

[prior] [a]greement, not an independent collateral agreement."[216] Such is simply not true of the course of dealing in this case as recited above.

Because the 2008 oil and natural gas lease and addendum and the subsequent 2010 pipeline right-of-way agreement and addendum are distinct agreements, I must next consider whether there is any genuine dispute of material fact that Paragraph 12 of the lease addendum was not incorporated by the introductory paragraph of the addendum to the 2010 right-of-way agreement.

> **2.    There is no genuine dispute of material fact that Paragraph 12 of the lease addendum was not incorporated by the introductory paragraph of the addendum to the 2010 right-of-way agreement.**

"[U]nder Pennsylvania law, incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship."[217] Another federal court interpreting Pennsylvania law has instructed that

---

[216] Id. at 188.

[217] Chesapeake Appalachia, LLC v. Scout Petroleum, LLC, 809 F.3d 746, 761 (3d Cir. 2016) (Cowen, J.) (internal quotation marks omitted).

"[t]he doctrine of incorporation by reference dictates that where a writing

refers to another document, that other document, or so much of it as is

referred to, is to be interpreted as part of the writing."[218]

"Incorporation by reference is a question of law."[219] It "requires a

reference in one document to the terms of another. Moreover, the

incorporating document must not only refer to the incorporated document,

it must bring the terms of the incorporated document into itself as if fully

set out."[220]

As the facts here reveal, evidence of an intent between the parties to

incorporate the contested provisions from the 2008 lease agreement into

the subsequent 2010 right-of-way agreement is strained at best in an

everyday sense and wholly inoperative from a legal perspective. The text

---

[218] Shadowbox Pictures, LLC v. Glob. Enterprises, Inc., No. CIV.A. 05-2284, 2006 WL 120030, at *7 (E.D. Pa. Jan. 11, 2006).

[219] Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1343 (Fed. Cir. 2008).

[220] Sucesion J. Serralles, Inc. v. United States, 46 Fed. Cl. 773, 785 (2000). Accord Northrop, 535 F.3d at 1344–47; Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 447 (3d Cir.2003).

of the introductory paragraph of the addendum to the 2010 right-of-way

agreement is the cornerstone of my determination. It reads as follows:

> This addendum is attached to and made part of that certain
> Right of Way Agreement dated <u>October 19, 2010.</u> If any of the
> following provisions conflict with or are inconsistent with any
> of the printed provisions or terms of the Right of Way
> Agreement or Original Oil and Gas Lease and Addendum the
> following provisions, and the non conflicting terms of the
> Original Oil and Gas Lease and its Addendum, shall control
> and be deemed to supersede the printed terms of the Right of
> Way Agreement.[221]

For all intents and purposes, the above-quoted language is the sole

source of support upon which Plaintiff bases its argument. It is too

insubstantial a showing to avoid summary judgment. The first inquiry

goes to the paragraph's ambiguity, of which I would determine there is

none, and that is the only viable interpretation.

There is, for instance, no ambiguity as to the conditional nature of

incorporation: "If any of the following provisions conflict with or are

inconsistent with any of the printed provisions or terms of the Right of

Way Agreement or Original Oil and Gas Lease and Addendum" is the

---

[221] ECF No. 29 at 10–11 ¶ 59. ECF No. 38 at 6 ¶ 59. <u>See also</u> ECF No. 29 Ex. 12 at 5
("Addendum").

condition's antecedent. Absent any evident conflict between one of the enumerated provisions of the 2010 right-of-way agreement's addendum, incorporation of any term from any other document is textually foreclosed.

Notably, none of the terms in the 2010 right-of-way agreement's addendum address the distinction between native and non-native gas at all. What would have been the obvious course of action by a party who sought above all else to preserve the native gas requirement? Certainly, it would have been to include an explicit provision referencing the preservation and incorporation of Paragraph 12 of the original lease's addendum into all subsequent right-of-way agreements. At least that much would have been apparent to a legal professional reasonably practiced in the arena of oil and gas law. In effect, Plaintiff would have been far better off to have simply said more with less.

Moreover, upon review of the parties' arguments as to the existence of any patent conflicts, it would be clear to any reasonable trier of fact that no such conflicts exist. Plaintiff's sole and rather tepid attempt to present conflicting terms is that the 2010 right-of-way agreement states that

Defendant "shall pay reasonable damages which, if any, may arise to crops, fences, buildings, and drain tile from laying operating, maintaining, repairing, replacing and removing said pipeline(s)," whereas the addendum to that agreement requires Defendant to "promptly replace any barrier, including but not limited to fences and stone walls removed by [Defendant] during the operations on said land."[222]

Stepping back and taking a broad view of things, that is an awkward argument. In the first instance, were Plaintiff correct, that would effectively mean that the parties entered into a right-of-way agreement whose terms were made immediately ineffective upon simultaneous execution of the addendum. "[I]f the plain meaning of a contract term would lead to an interpretation that is absurd and unreasonable, Pennsylvania contract law allows a court to construe the contract otherwise in order to reach the only sensible and reasonable interpretation of the contract."[223] If there exists a conflict between the provisions of the

---

[222] ECF No. 38 at 8 ¶ 70.

[223] <u>Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.</u>, 247 F.3d 79, 96 (3d Cir. 2001) (Becker, C. J.) (internal quotations omitted).

right-of-way and its addendum now, then there existed a conflict the moment documents were brought to fruition, rendering the right-of-way agreement ineffective, according to Plaintiff. That would lead to the most absurd of consequences and tellingly, is a consequence of Plaintiff's failure to simply include plain language as to the native gas restriction that would have glaringly conflicted with Paragraph 12 of the lease addendum without such interpretive strain.

Secondly, Plaintiff's contention that a conflict exists between a provision that requires replacement of a removed fence and another that mandates a reasonable payment for damage to a retained fence is without merit on other grounds. As Defendant adequately outlines in its reply brief, those provisions co-exist "harmoniously" so as to cover two distinct scenarios: the first, outright replacement and the second, payment for minor repairs short of those requiring a new fence altogether.

Thirdly, even if there were a conflict as to the repair or replacement of fences, the Court is at an interpretive loss as to how such conflict would justify complete eradication of the right-of-way agreement rather than

meticulous substitution of the original conflicted term regarding fences. That the parties conditioned the entirety of the right-of-way agreement on the discovery of such picayune distinctions is hard to imagine, both as a matter of practice and common sense.

The more charitable interpretation, and truly the only reasonable one, is that where a conflict exists between a term in the lease or right-of-way agreement and a term in the right-of-way agreement's addendum, then as stated, that conflicting provision of the addendum would supersede the conflicted term of the right-of-way agreement. Nowhere from the quoted language can it be discerned that a conflict involving a single fence post would nullify the remaining non-conflicting terms of the agreement and require halting the pipeline. That is certainly not what the parties bargained for.

Having concluded that there is simply no ambiguity as to whether Paragraph 12 of the lease addendum was incorporated by reference into the subsequent right-of-way agreement or addendum, I would add that the record in this case quite convincingly demonstrates that Plaintiff's

representative played a significant role in drafting the contested language, requiring that any such ambiguity should nevertheless be construed in favor of Defendant. "[U]nder the rule of <u>contra proferentem</u>, any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable."[224] Not only was David Schwoyer, Sr., admittedly instrumental in the drafting of the contested addendum language, but it is precisely his choice of words from which the present dispute flows.

Finally, although it follows logically from the preceding discussion, it is worth explicitly holding that because Paragraph 12 of the lease addendum was not properly incorporated into any subsequent agreement, Defendant committed no breach when it used the subject pipeline to transport non-native gas. Neither has Plaintiff adduced any contractual language indicating that Defendant has breached its obligations by failing to develop any additional wells on the leased premises. In light of the highly undulant nature of the industry's business cycle, this Court finds it

---

[224] <u>Colorcon, Inc. v. Lewis</u>, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) (citing <u>Sun Co. v. Pa. Tpk. Comm'n</u>, 708 A.2d 875, 878–79 (Pa.Commw.Ct.1998)).

necessary to construe such "failure to develop" claims with a hesitant

perspective. To that end, federal courts must "demonstrate[ ] a measured

temperance" when disposing of such claims, "recognizing full well that it

is not the judiciary's place to substitute its own judgment for that of a

business manager whose day-to-day closeness with his firm's operations

commands a certain deference."[225]

> **C.** **Plaintiff's Course Of Conduct Is Sufficient To Conclude That It Waived Any Expectation Or Right To Preserve The Domestic Gas Limitation. Plaintiff Is Thereby Estopped From Now Asserting Such A Claim.**

"A waiver in law is the act of <u>intentionally</u> relinquishing or

abandoning some known right, claim or privilege."[226] "To constitute a

waiver of legal right, there must be a clear, unequivocal and decisive act of

the party with knowledge of such right and an evident purpose to

surrender it."[227] "Waiver is essentially a matter of intention."[228] "A waiver

---

[225] <u>Moore v. CVS Rx Servs., Inc.</u>, No. 4:14-CV-01318, 2015 WL 6692266, at *16 (M.D. Pa. Oct. 30, 2015).

[226] <u>Brown v. City of Pittsburgh</u>, 409 Pa. 357, 360, 186 A.2d 399, 401 (1962) (Eagen, J.) (emphasis in original).

[227] <u>Id.</u>

[228] <u>Id.</u>

may be express or implied, but in the absence of an express agreement a

waiver will not be presumed or implied contrary to the intention of the

party whose rights would be injuriously affected thereby, unless by his

conduct the opposite party has been misled, to his prejudice, into the

honest belief that such waiver was intended or consented to."[229]

As such, "[w]aiver can be express or implied from conduct in

situations that would support equitable estoppel."[230] "Equitable estoppel

arises when one by his acts, representations, or admissions, or by his

silence when he ought to speak out, intentionally or through culpable

negligence induces another to believe certain facts to exist and such other

rightfully relies and acts on such belief, so that he will be prejudiced if the

former is permitted to deny the existence of such facts."[231]

Applying these doctrines to the context of real property, the

Superior Court of Pennsylvania has recognized that "[w]hen an owner of

---

[229] Atl. Ref. Co. v. Wyoming Nat. Bank of Wilkes-Barre, 356 Pa. 226, 236-37, 51 A.2d 719, 725 (1947).

[230] Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 148 (3d Cir. 1999) (Becker, C. J.).

[231] Nw. Nat. Bank v. Commonwealth, 345 Pa. 192, 196, 27 A.2d 20, 23 (1942).

land, with full knowledge of the facts, tacitly permits another to do acts upon the land, a license is implied."[232] Although such permission is in certain circumstances revocable, it "may become irrevocable when the person granted the license has expended money and treated the property in a manner that they would not have treated it, but for the license."[233]

In <u>Zivari v. Willis</u>, for example, the Superior Court of Pennsylvania found the doctrines of waiver and equitable estoppel appropriate in a property dispute involving access to land.[234] That case involved neighbors whose properties abutted each other in a cul-de-sac development.[235] One of the neighbors sought to remove his driveway and situate it differently on his land such that access to from his new driveway to the public cul-de-sac required him to briefly travel upon his neighbor's private road.[236] When the neighboring owner of the private road observed the construction, he

---

[232] <u>Zieglar v. Reuss</u>, No. 1588 WDA 2013, 2014 WL 10916932, at *10 (Pa. Super. Ct. June 20, 2014)

[233] <u>Id.</u>

[234] <u>Zivari v. Willis</u>, 416 Pa. Super. 432, 434, 611 A.2d 293, 294 (1992).

[235] <u>Id.</u>

[236] <u>Id.</u> at 434–35.

remarked, "Well of course, I'll let you use it, but you should have asked."[237] When the owner of the private road later challenged his neighbor's using the road, the Superior Court rejected the owner's claim on the grounds of waiver and equitable estoppel, noting that "once appellees relied on this statement to their detriment, appellants are estopped from denying appellees access to the road."[238]

Despite its failure to incorporate Paragraph 12 of the lease addendum into subsequent agreements, I find that Plaintiff's course of conduct after signing the initial lease suggests both that the provision had been waived and that Plaintiff should be estopped from asserting a claim based upon that provision. Several of the factual circumstances of this dispute support such a finding. First, Plaintiff accepted significant consideration above and beyond what the lease and addendum required when it entered into the subsequent right-of-way agreements. Not only does this support the individual nature of such agreements, but it also shows that Defendant paid Plaintiff certain extra consideration to

---

[237] Id. at 435.

[238] Id. at 437.

surrender additional contractual rights that Defendant did not already possess.

Moreover, the very course of conduct through which Plaintiff continued to deal with Defendant suggests that its members were willing to work with Defendant on an extended basis. Even though the relationship appears to have been far from perfect, it was also apparently far from irreparable for the majority of its existence. At any time after 2008, Plaintiff could have initiated immediate legal action against Defendant had it believed that Defendant's conduct ran afoul of the core tenets of their agreements. The Court finds it telling, however, that such action was not instituted until July 30, 2014, nearly six years from the onset of the initial lease. Certainly, in addition to the desire to preserve actions carried out in reasonable reliance upon a promise, an equally important judicial motivation for such doctrines as waiver and estoppel is to discourage litigants from "sleeping on their rights."[239]

---

[239] See Upton v. Tribilcock, 91 U.S. 45, 55, 23 L. Ed. 203 (1875) ("Relief is not given to those who sleep on their rights."). See also U.S. on Behalf of Small Bus. Admin. v. Richardson, 889 F.2d 37, 40 (3d Cir. 1989).

Furthermore, the Court finds it quite relevant that Robert Schwoyer was willing to accept variations of the final right-of-way amendment that did not depict the necessary connecting segment of the pipeline, and that Mr. Schwoyer, who visited the construction site on a daily basis, failed to otherwise contest Defendant's right-of-way until now. It is evident that Defendant relied upon these interpretations in constructing its pipeline, and the appropriate remedy now simply as a matter of economics and common sense cannot require such retrograde measures as rerouting of the pipeline or the gas it carries.

It is important to recognize that such determines of waiver and estoppel are necessarily fact-specific ones, but on the basis of the record before the Court, I would hold that at this point, Plaintiff has effectively waived the domestic gas requirement as it pertains to the subsequent right-of-way agreements and is therefore otherwise estopped from asserting a claim on such grounds.

**IV.   CONCLUSION**

Ultimately, this dispute has presented to this Court the opportunity to resolve important issues involving the interpretation of contractual agreements in the natural gas setting, particularly in light the nuanced economic climate of such an industry. For the foregoing reasons, Defendant's Motion for Summary Judgment is granted, and Plaintiff's corresponding Motion for Summary Judgment is denied.

An appropriate Order follows.

BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge